IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| MARGARITA LOPEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No.   CV 09-0109-TUC-FRZ (BPV) |
| vs. | ) | |
| | ) | **REPORT AND** |
| PIMA COUNTY, et al., | ) | **RECOMMENDATION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Presently pending before the Court is a Defendant's Motion for Summary Judgment (Doc. 126), pursuant to Rule 56,  Federal Rules of Civil Procedure.

I.    **PROCEDURAL BACKGROUND**

Plaintiff, Margarita Lopez, filed the instant action on February 27, 2009, alleging employment discrimination and retaliation by Defendants, Pima County and the Pima County Health Department. (Doc. 1.)

On March 13, 2009, this case was referred to United States Magistrate Judge Bernardo P. Velasco for all pretrial proceedings and report and recommendation.

On May 15, 2009, the Court entered an Order dismissing Defendant Pima County Health Department pursuant to stipulation. (Doc. 19)

On September 17, 2010, Defendants filed a motion for summary judgment (Doc. 126), along with supporting statement of facts ("DSOF"). Plaintiff filed a response (Doc. 140), controverting statement of facts ("PCSOF")(Doc. 141), and separate statement of facts ("PSOF") (Doc. 142).  Defendant filed a reply (Doc. 143) and objections to Plaintiff's separate statements of facts (Doc. 144). Oral argument on the motion was heard before Magistrate Judge Velasco on February 17, 2011. For reasons

1   which follow, the Magistrate Judge recommends that the District Court DENY IN

2   PART and GRANT IN PART Defendants' Motion for Summary Judgment.

3   **II.    FACTUAL BACKGROUND**

4          From 1996 to 2004, Lopez worked for Pima County as a Behavioral Health

5   Technician at Kino Community Hospital. (DSOF 1, 2, 3). In 2004, Pima County turned

6   Kino Hospital over to University Physicians.  (PSOF 23). As part of the layoff process

7   at Kino, Lopez completed an application to enable her to continue to work for Pima

8   County. (DSOF 5; PSOF 24). On June 28, 2004, Lopez was reappointed to a

9   Community Nutrition Specialist ("CNS") position in the Pima County Health

10  Department's ("Department") Women, Infants and Children ("WIC") program. (DSOF

11  4). As a CNS, Lopez was required to use a computer database to certify WIC clients

12  among other things. (DSOF 40, 41). After the reappointment, Lopez participated in 4-6

13  weeks of classroom training for her new position. (DSOF 24, 42, PSOF 27). As part of

14  the training, Lopez had to review material in a training manual consisting of

15  approximately 488 pages. (DSOF 25, 43, 44, 46). Lopez testified that she had to do "a

16  lot" of reading when she first started at WIC, and she was behind all the time. (DSOF

17  45, Exhibit 1, Deposition of M. Lopez, p.99, ll. 25 - p. 100, ll. 2). Lopez also completed

18  a number of quizzes and filled out training record forms. (DSOF 29 – 31, 47). Lopez

19  also testified that she focused her eyes to use the training computer at WIC. (DSOF

20  166).

21         During her employment in WIC, the Department progressively disciplined

22  Lopez. On November 10, 2004, the Department gave Lopez a Letter of Reprimand.

23  (DSOF 49). Lopez then got a Notice of Suspension on January 20, 2005. (DSOF

24  50). On March 3, 2005, the Department issued Lopez a Notice of Intent to Dismiss.

25  (DSOF 52). Lopez attended a pre-action meeting on March 15, 2005, with a

26  Department representative, Kim Janes. (DSOF 53). Janes then prepared a

27  memorandum summarizing the meeting and recommending that the Department

28

proceed with the dismissal. (DSOF 54). The Department's Director, Dennis Douglas, reviewed Janes's memorandum on March 16, 2005 and added a handwritten note telling his personnel staff to proceed with finalizing the dismissal. (DSOF 55). On March 22, 2005, Lopez filed a Charge of Discrimination ("Charge") with the Arizona Civil Rights Division. (Doc. 1, Ex. 1; DSOF 58). On March 23, 2005, Douglas sent Lopez a letter informing her that the decision regarding the Notice of Intent to Dismiss would be delayed until a determination could be made about whether Lopez was a qualified individual with a disability. (DSOF 59). On March 28, 2005, Pima County received notice of the Charge. (DSOF 60). On May 24, 2005, Lopez and representatives from the Department attended mediation at the Arizona Attorney General's Office regarding the Charge. (DSOF 61). The Department signed a mediation agreement on or about June 21, 2005. (DSOF 62). On July 12, 2005, Douglas decided Pima County would no longer participate in mediation. (DSOF 63, 64). On July 14, 2005, Douglas signed a Notice of Dismissal for Lopez. (DSOF 65; PSOF 94)

In her Complaint, Lopez alleges that she has a substantial limitation in the major life activity of seeing. (Doc. 1, ("Complaint") at ¶ 5). More specifically, during her deposition, Lopez testified that, with glasses, "it's no problem to see" but her "disability is reading." (DSOF 67, Exhibit 1, Deposition of M. Lopez, p.30, ll. 1 - 16). Sunlight and fluorescent light, however, cause Lopez pain and migraines. (DSOF, Exhibit 1, Deposition of M. Lopez, p. 30, ll. 14- ll. 23).

Lopez had a retinal detachment that was surgically repaired in 1985. (DSOF 69, 71, 84). Lopez's medical records show that she is myopic and has a visual field defect. (DSOF 77, 84, 86). Based on Dr. Novalis's records, Defendant states that Lopez's corrected visual acuity in her left eye is 20/20 and has varied over time in her right eye from 20/30 to 20/60. (DSOF 76). Plaintiff asserts that, more specifically, during the relevant time period, (June 2004 - July 2005), the visual

- 3 -

acuity in her right eye varied from 20/40 to 20/60.  (PSOF 8). The difference in her refractive error makes it difficult for her eyes to work together to see a single clear image. (DSOF 84). Lopez's medical records also show that she has complained about difficulty with near and intermediate vision and with binocular vision. (DSOF 78). She has specifically complained about problems using computer monitors. (DSOF 79, 84, 88). Lopez is also light sensitive, has double vision, blurring, eye pain, and eye fatigue. (DSOF 73, 87). In addition, glare is a problem for Lopez especially when reading glossy paper and when using a computer. (DSOF 84, 90, PSOF 14,15,16).

Though the parties disagree on when Lopez initially saw Janet Dylla, a low vision specialist (DSOF 80, PSOF Exhibit 2: Lopez Affidavit ¶ 24), they agree that she was evaluated by Dylla in March 2005. (DSOF 80, 81; PSOF 81). Dylla prepared a report regarding that evaluation. (DSOF 82). During the evaluation, Dylla got a history from Lopez. (DSOF 83). Lopez told Dylla she was not able to read for prolonged periods of time. (DSOF 87, 88, 89). Dylla and Lopez identified three goals for Lopez: reading small print more easily and comfortably, controlling glare indoors and outdoors without further reducing vision, and evaluating Lopez's need for task lighting. (DSOF 91).

Lopez testified that she drives to work, to the supermarket, to an annual doctor's appointment, and to Nogales, Arizona. (DSOF 103, 104, 107-109). Part of the trip to Nogales involves driving on Interstate 19. (DSOF 110). While in Nogales, Lopez drives her mother to appointments, to the bank, and to shop. (DSOF 112, 113). Lopez has no restrictions on her driver's license. (DSOF 102). Lopez also picks out her clothing every day. (DSOF 114). Lopez wears earrings, which she puts on and keeps organized in a jewelry box. (DSOF 118). She is able to lace and tie her shoes and button her own clothing. (DSOF 121, 122). Lopez can sew on a button and is able to thread a needle. (DSOF 123). Lopez can cut her nails when she wears

1    her glasses and is able to put on lipstick and powder when she uses a mirror with

2    magnification. (DSOF 115 -117, 119). Lopez can use a telephone, but does not use a

3    cell phone because the light bothers her eyes and the buttons are too small. (DSOF

4    124, 125). Lopez does her own laundry, cleans her house, and prepares her own

5    meals. (DSOF 126, 127, 129, 132). Lopez uses both a stove and a microwave oven.

6    (DSOF 130, 131). Lopez is able to manage hot liquids and foods when cooking

7    because she can see what is boiling and hot. (DSOF 133).  She can also read her own

8    handwriting. (DSOF 151).  Lopez is also able to recognize faces when she wears her

9    prescription glasses. (DSOF 67).

10          At the time Lopez was evaluated by low vision specialist Dylla, in March,

11   2005, Lopez did not have any low vision aids.  (DSOF, Ex. 16, p.23)  Before Lopez

12   had her low vision aids, she would "force [her] eyes" to read things like her bills.

13   (DSOF 136, 141, 142, 165). She also testified that she would "force her eyes" to

14   read after her surgery in 1985 and before she had her magnifier. (DSOF 141, 142).

15   Lopez further testified that she reads slower "than everybody." (DSOF 141).

16          Lopez testified to many activities she can perform with low vision aids.

17   Lopez pays her bills and can fill out a standard size check. (DSOF 136 - 138). She

18   also takes care of her outdoor plants.  (DSOF 134, 135) Lopez can read labels on

19   cleaning products with her magnifier. (DSOF 128). She can read her watch when

20   wearing her Spectrashields. (DSOF 120). Lopez can read for two hours with her

21   reading glasses (yellow lenses) and Ott-Lite. (DSOF 153, 160). She can also read by

22   using her magnifier and Zoomtext on the computer. (DSOF 156). Lopez uses her

23   Ott-Lite and "special glasses" to enter information into the computer in her current

24   job (DSOF 157) and she uses her magnifier to read medication sheets. (DSOF 159).

25   When Lopez was filing at her current job, she used her magnifier, her Ott-Lite, and

26   her reading glasses to read documents. (DSOF 160). Lopez can also use spell-check

27   on the computer with her glasses and her magnifier. (DSOF 161). She can read

28                                        - 5 -

1   classroom training materials in her current job by using her magnifier and

2   Spectrashields. (DSOF 162).

3          There are some activities that Lopez testified she performs, but it is not clear

4   from her deposition testimony that she performs these activities with or without the

5   use of low vision aids.  Lopez can read street signs and traffic signs but has to stop

6   driving to read side street signs because they are smaller (DSOF 106; Deposition of

7   M. Lopez, p.28 ll. 5-20). It is apparent that Lopez was driving both before and after

8   she acquired her low vision aids, though before she acquired the low vision aids,

9   driving, at least at night, was stressful and she drove with her foot on the brake.

10  (DSOF, Ex. 1, Deposition of M. Lopez, p.27 ll. 6-13).   Lopez testified that she can

11  read 24 point font print without magnification. (DSOF 150).  Again, it is not clear if

12  this is with, or without, other low vision aids.  (DSOF, Ex. 1, Deposition of M.

13  Lopez, p.29, ll. 14-20.).

14         While working at Kino Hospital, Lopez worked on a computer, did

15  paperwork, and did filing. (DSOF 163 - 165). Lopez would "force her eyes" to read

16  documents while working at Kino Hospital. (DSOF 165). Lopez does not read books

17  as a hobby because she does not enjoy it. (DSOF 140, 144). She also does not read

18  menus and has her friends read them to her. (DSOF 145). Lopez has not read

19  magazines since her surgery in 1985. (DSOF 149). Lopez has never read the

20  newspaper. (DSOF 146 - 148).

21  **III.    SUMMARY JUDGMENT STANDARD**

22         Pursuant to the Federal Rules of Civil Procedure, a party may seek summary

23  judgment  where there is no genuine issue as to any material fact and that party is

24  entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  Summary judgment is

25  appropriate only when "the pleadings, depositions, answers to interrogatories, and

26  admissions on file, together with the affidavits, if any, show that there is no genuine

27  issue as to any material fact and that the moving party is entitled to a judgment as a

28

matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.* at 250; *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Rule 56(c) provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  An issue of fact must be genuine.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).  If the factual context makes the non-movant's claim implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary.  *Matsushita*, 475 U.S. at 587.  The mere existence of a scintilla of evidence supporting the non-movant's position will be insufficient; there must be evidence from which a fair-minded  jury could reasonably find for the non-movant.  *Anderson*, 477 U.S. at 252.

1  When considering a summary judgment motion, the court examines the pleadings,

2  depositions, answers to interrogatories, and admissions on file, together with the

3  affidavits or declarations, if any.  See Fed. R. Civ. P. 56(c).  However, the "trial court

4  can only consider admissible evidence...."  *Orr v. Bank of America*, 285 F.3d 764,

5  773 (9th Cir. 2002).  At the summary judgment stage, the trial court's function is not

6  to weigh the evidence and determine the truth but to determine whether there is a

7  genuine issue for trial.  *Anderson*, 477 U.S. at 249.  Nor is the trial court to make

8  credibility determinations.  *Musick  v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

9  The ultimate question is whether the evidence "presents a sufficient disagreement to

10  require submission to a jury or whether it is so one-sided that one party must prevail

11  as a matter of law." *Anderson*, 477 U.S. at 251-52.  The evidence of the non-movant

12  is "to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at

13  255.  But, if the evidence of the non-moving party is merely colorable or is not

14  significantly probative, summary judgment may be granted.  *Id*. at 248-49.

15      The Ninth Circuit has stated that "[a]s a general matter, the plaintiff in an

16  employment discrimination action need produce very little evidence in order to

17  overcome an employer's motion for summary judgment.  This is because 'the

18  ultimate question is one that can only be resolved through a searching inquiry-one

19  that is most appropriately conducted by a factfinder, upon a full record.'" *Chaung v.*

20  *University of Calif. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v.*

21  *Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)).

22  **IV.   DISCUSSION**

23      This is a workplace discrimination case arising out of a request for reasonable

24  accommodation and a subsequent dismissal. Specifically, Plaintiff Margarita Lopez

25  ("Lopez") alleges that she is a person with a disability and that Defendant Pima

26  County ("Pima County") failed to provide her with reasonable accommodation in

27  violation of the Americans with Disabilities Act ("ADA"). (Complaint, Count One).

28                                    - 8 -

1    In addition, Lopez alleges that she was subjected to retaliation in violation of the

2    ADA. (Complaint, Count Two).

3          Defendant Pima County moves for summary judgment on the grounds that

4    the employee, Margarita Lopez, was not disabled as defined under the American

5    with Disabilities Act (ADA), and Plaintiff has not established a *prima facie* case of

6    retaliation.

7          A.    Failure to Accommodate

8          Though the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat.

9    3553 (2008) ("ADAAA") alters the ADA's definition of "disability," the Ninth

10   Circuit has concluded that the ADAAA, effective January 1, 2009, does not apply

11   retroactively.  *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th

12   Cir. 2009).  Because the alleged discriminatory conduct in this action occurred

13   before January 1, 2009, Lopez's claims will be analyzed under the law in effect in

14   2008.

15         Though Plaintiff argues that the Ninth Circuit instructed that "the original

16   congressional intent as expressed in the [ADAAA]" is still relevant and appropriate

17   to a court's analysis of a pre-ADAAA action, citing *dicta* in *Rohr v. Salt River*

18   *Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 861 (9th Cir. 2009), the

19   Plaintiff has not persuaded this Court that it is not controlled by the Supreme Court's

20   interpretation of the relevant ADA standards articulated in *Sutton v. United Air*

21   *Lines, Inc.*, 527 U.S. 471 (1991) and *Toyota Motor Mfg., Inc. V. Williams*, 534 U.S.

22   184 (2001), discussed *infra*, and their progeny.

23         In order to be disabled under the Americans with Disabilities Act (ADA),

24   Lopez must show that, at the time of the adverse employment action, Lopez suffered

25   from a physical impairment that substantially limited her in one or more major life

26

27

28                                                              - 9 -

1   activities. *Toyota*, 534 U.S. at 195-195; 42 U.S.C.A. § 12102(1)[1]. An individualized

2   inquiry is required when deciding when a person is disabled.  *Sutton*, 527 U.S. at

3   483.

4          Both seeing and reading have been recognized as major life activities.  29

5   C.F.R. § 1630.2(i)(seeing); *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1062

6   (9th Cir. 2005)(reading); *EEOC v. UPS*, 306 F.3d 749, 797 (9th Cir. 2002)(seeing).

7          A major life activity is substantially limited if an individual is "unable to

8   perform" the activity or is "significantly restricted as to the condition, manner or

9   duration" under which the individual can perform the activity compared to an

10  average person in the general population. 29 C.F.R. § 1630.2(j)(1). An impairment

11  does not substantially limit a major life activity if it is "corrected by medication or

12  other measures ...." *Sutton*, 527 U.S. at 482-83. Therefore, disabilities under the

13  ADA must "be determined with reference to corrective measures ...." *Id*. at 488.

14         The parties do not dispute that Plaintiff's visual impairments amount to a

15  physical impairment under the ADA.  The relevant question, therefore, is whether

16  Plaintiff's visual impairments substantially limit Plaintiff in the major life activities

17  of seeing and reading.

18         "Substantial limitation" means that an individual is "unable to perform a

19  major life activity that the average person in the general population can perform; or

20  significantly restricted as to the condition, manner, or duration under which an

21  individual can perform a particular major life activity as compared to the condition,

22  manner, or duration under which the average person in the general population can

23  perform that same major life activity.  29 C.F.R. § 1630.2(j)(1).  The following

24  factors should also be considered when deciding if a plaintiff is substantially limited:

25  ─────────────────

26         [1] All references to the ADA are to the version in existence at the time of the
        incidents at issue in this case because the changes made by the ADA

27         Amendments Act of 2008 are not retroactive. *Becerril*, 587 F.3d 1164.

28                                        - 10 -

1  "(1) the nature and severity of the impairment; (2) the duration or expected duration
2  of the impairment; (3) the permanent or long term impact, or the expected permanent
3  or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).
4  This analysis also includes consideration of the impact of any "mitigating measures"
5  a plaintiff may use.  *Sutton*, 527 U.S. at 482.  Mitigating measures can include
6  measures undertaken with the body's own systems.  *Albertson's v. Kirkingburg*, 527
7  U.S. 555, 566 (1999).

8      A restriction of a major life activity is substantial if it is "considerable" or
9  limits the activity "to a large degree." *Toyota*, 534 U.S. at 196-97. Similarly, that
10 [the plaintiff] merely suffers from some limit does not mean that she suffers a
11 substantial limit."  *Fraser v. Goodale*, 342 F.3d 1032, 1041 (9th Cir. 2003).
12 Individuals who claim the ADA's protection must show, "in terms of their own
13 experience," that their impairment causes a substantial restriction on a major life
14 activity.  *Toyota*, 534 U.S. at 198.

15     To be disabled in the major life activity of seeing, "the impairment must
16 prevent or severely restrict use of [plaintiff's] eyesight compared to how unimpaired
17 individuals normally use their eyesight in normal life."  *UPS*, 306 F.3d at 797.  "The
18 critical inquiry is whether seeing as a whole is substantially limited for purposes of
19 daily living." *Id* at 803. Similarly, a plaintiff must present evidence that she is
20 "substantially limited in [her] ability to read for purposes of daily living, or as
21 compared to what is important in the daily life of most people."  *Wong v. Regents of*
22 *University of California*, 410 F.3d 1052 (9th Cir. 2005). The ability to see or read for
23 purposes of daily life is not to be evaluated by what a claimant's job might require,
24 but by activities such as the ability to use eyesight in daily activities such as driving,
25 reading, using tools, playing sports, reading newspapers, government forms, street
26 signs or the like. *Id*., citing *Toyota*, 534 U.S. at 201-02; and *UPS*, 306 F.3d at 803.

27

28

- 11 -

1    Defendant submits that Lopez has not presented sufficient evidence to show

2 that she is substantially limited in the major life activities of seeing or reading for

3 purposes of daily living or as compared to how others use their eyesight in daily life.

4    Lopez did, in fact, testify during her deposition that she sees "perfectly" and

5 her disability is only "reading." It is evident, however, that her vision is not, in fact,

6 "perfect," and that there is a question of fact as to whether or not Plaintiff is

7 substantially limited in the major life activities of seeing and reading.

8    While there are some activities of daily living that the evidence suggests

9 Plaintiff performs **without restriction:** (choosing her clothing and accessories,

10 trimming her nails, using a telephone, doing laundry, cleaning her house, preparing

11 her meals, using a stove and microwave, managing hot foods and liquids, threading a

12 needle and sewing on a button, reading large street signs, completing a job

13 application); there are some activities that the evidence demonstrates Plaintiff

14 performs, but **in a limited fashion:**(driving to familiar places only or practicing or

15 preparing to drive to unfamiliar places, not using a ruler or tape measure, reading

16 conventionally and on a computer screen, utilizing internal and external mitigating

17 measures, reading her own handwriting, reviewing nearly 500 pages of training

18 material, completing quizzes and filling out training record forms, and using the

19 training computer at WIC, "forcing" her eyes to read things like bills); and other

20 activities that Plaintiff performs with **mitigating aids that were unavailable** at the

21 time Plaintiff brought the charges in this action: (Reading cleaning labels,

22 recognizing faces, paying her bills and filling out standard size checks, taking care

23 of outdoor plants, and reading labels on cleaning products, reading her watch,

24 reading for two hours, reading on the computer, entering information on the

25 computer, reading medication sheets, reading documents, using spell-check on the

26 computer, reading classroom training materials); activities that Plaintiff **does not do**

27 **at all:** (using a cell phone, reading small street signs while driving, watching

28

- 12 -

1   television or movies, enjoying outdoor activities during the daytime such as
2   gardening, reading recreationally, using grocery lists, reading ingredient lists on
3   canned foods, reading newspapers or magazines, riding a bike, doing yoga); and
4   activities that Plaintiff has adapted methods that **do not require her to rely on her**
5   **reading or seeing ability** to perform: (Memorizing sequence of numbers on the
6   microwave, tying her shoes, ordering food at a restaurant, remembering what foods
7   to buy at a grocery store).

8        Plaintiff has presented enough evidence that she is substantially limited in the
9   major life activities of seeing and reading to demonstrate a material, factual dispute..
10  Furthermore, it is evident from the deposition testimony that many of Plaintiff's
11  activities of daily living that Defendants rely on to demonstrate that she is not
12  substantially limited were undertaken with mitigating measures that were not
13  available to Plaintiff at the time she was working at the Pima County Health
14  Department.  Defendant has not pointed this Court to any caselaw that suggests that
15  mitigating measures available to a claimant after a request for accommodation may
16  be considered when deciding if a plaintiff is substantially limited, and, moreover,
17  Defendants have not sufficiently clarified to this Court's satisfaction which activities
18  of daily living Plaintiff was able to perform without mitigating aids available only
19  after 2006. Considered together, the limitations and activities that Plaintiff performs
20  with mitigating aids unavailable during the relevant time period, raise an issue of
21  material fact as to whether or not Plaintiff is substantially limited in the major life
22  activities of seeing and reading.

23       Plaintiff has demonstrated that there exists contested genuine issues of
24  material fact concerning whether Lopez suffers from a physical impairment that
25  substantially limited her in the major life activities of seeing or reading.
26  Accordingly the Magistrate Judge recommends that the District Judge deny

27

28                                    - 13 -

1   Defendant's motion for summary judgment on the grounds that Plaintiff has failed to
2   prove that she is disabled under the ADA.

3          B.      Retaliation

4          The ADA provides: "No person shall discriminate against any individual
5   because such individual has opposed any act or practice made unlawful by this
6   chapter or because such individual made a charge, testified, assisted, or participated
7   in any manner in an investigation, proceeding, or hearing under this chapter." 42
8   U.S.C. § 12203(a). To establish a *prima facie* case of retaliation under the ADA, an
9   employee must show that: (1) he or she engaged in a protected activity; (2) suffered
10  an adverse employment action; and (3) there was a causal link between the two.
11  *Brown v. City of Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003). If the employee
12  establishes a *prima facie* case, the employee will avoid summary judgment unless
13  the employer offers legitimate reasons for the adverse employment action,
14  whereupon the burden shifts back to the employee to demonstrate a triable issue of
15  fact as to whether such reasons are pretextual. *See Brooks v. City of San Mateo*, 229
16  F.3d 917, 928 (9th Cir. 2000).

17         Defendant asserts that the protected activity must precede the adverse action
18  because the adverse action must be motivated by the protected activity, citing *Silver*
19  *v. KCA, Inc.*, 586 F.2d 138, 143 (9th Cir. 1978)(stating that if a charge is not filed
20  with the EEOC until after the discharge, the latter cannot be motivated by a desire to
21  retaliate for the former.)  Additionally, Defendant argues that a plaintiff cannot
22  prove causation when the employer is contemplating the adverse action prior to the
23  employee's protected activity.

24         Plaintiff does not contest these legal assertions, but asserts that Lopez
25  suffered adverse employment actions through disciplinary actions and eventual
26  discharge after two protected activities which she alleged in her complaint: (1)

27

28                                         - 14 -

1 complaining that the County was violating the law by not accommodating her; and

2 (2) firing her for not signing the Settlement Agreement.

3        Defendant rebuts this assertion by demonstrating that the County was

4 contemplating her dismissal prior to Lopez filing the Charge of Discrimination on

5 March 22, 2005, or refusing to sign the Settlement Agreement between June 21,

6 2005 and July 12, 2005.   The Department first issued a Notice of Intent to Dismiss

7 Lopez on March 3, 2005, and Dennis Douglas, the Department's Director, directed

8 his staff to proceed with finalizing the dismissal on March 16, 2005.

9        Plaintiff did not address Defendant's contention in her response, and has not

10 identified any facts controverting the arguments and facts in Defendant's motion for

11 summary judgment regarding her retaliation claim.  Lopez cannot establish her

12 *prima facie* case of retaliation because Pima County had initiated Lopez's

13 termination before she filed her Charge of Discrimination and before the parties

14 attended mediation.  Accordingly, the Magistrate Judge recommends that the District

15 Judge grant Defendant's motion for summary judgment on the grounds that Plaintiff

16 has failed to prove that she has failed to produce sufficient admissible evidence to

17 establish her *prima facie* case of retaliation.

18 **V.     RECOMMENDATION**

19        The Magistrate Judge finds that material issues of fact exist and summary

20 judgment should be denied on the issue of whether Lopez was disabled as defined

21 by the ADA.  The Magistrate Judge further finds that no material issues of fact exist

22 and summary judgment should be granted on the issue of whether Plaintiff has

23 established a *prima facie* case of retaliation.

24        Accordingly, the Magistrate Judge recommends that the District Judge enter

25 an order, DENYING IN PART and GRANTING IN PART Defendant's Motion for

26 Summary Judgment (Doc. No. 126) as follows:

27

28

(1)    Summary Judgment should be DENIED on the issue of whether Lopez was a qualified person with a disability, specifically, whether Lopez is substantially limited in the major life activities of seeing or reading.

(2)    Summary Judgment should be GRANTED on the issue of whether Lopez was subject to retaliation.

DATED this 27th day of April, 2011.


_____

Bernardo P. Velasco
United States Magistrate Judge